**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


JOANDREA L. GALLOWAY,    )
                             )
          Plaintiff,    )
                             )
    v.                 )        1:14CV362
                             )
CAROLYN W. COLVIN,      )
Acting Commissioner    )
of Social Security,    )
                             )
         Defendant.    )

## <u>MEMORANDUM OPINION AND RECOMMENDATION<br>OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff brought this action under the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant denying Plaintiff's claim(s) for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 2.) The Court has before it the certified administrative record (Docket Entry 9 (cited as "Tr. __")), as well as the parties' cross-motions for judgment (Docket Entries 10, 12). For the reasons that follow, the Court should remand this case for further administrative proceedings.

### <u>PROCEDURAL HISTORY</u>

Plaintiff applied for DIB and SSI, alleging a disability onset date of February 12, 2011. (Tr. 190-200.) Upon denial initially (Tr. 89-120) and on reconsideration (Tr. 121-56), she requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 10). Plaintiff, her then-attorney, and a vocational expert ("VE")

attended the hearing (on February 6, 2013), at which Plaintiff amended her alleged onset date to June 14, 2011. (Tr. 53-88.) On March 29, 2013, the ALJ ruled Plaintiff not disabled under the Act. (Tr. 15-26.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's ruling the Commissioner's final decision for purposes of judicial review. (Tr. 1-4.)

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the [] Act through December 31, 2016.

2. [Plaintiff] has not engaged in substantial gainful activity since . . . the amended alleged onset date.

3. [Plaintiff] has the following severe impairments: intercranial [sic] hypertension; headaches secondary to pseudotumor cerebri; chronic pain syndrome/pain disorder; occipital neuralgia; post motor vehicle accident with spleen laceration and rib fractures; tendonitis of the left foot; dysthmyic disorder; anxiety; identity problems/disorder; borderline intellectual functioning; and obesity.

. . . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with lifting up to 20 pounds occasionally and lifting or carrying up to 10 pounds frequently; standing or walking for approximately 4 hours per 8 hour workday and sitting for approximately 4 to 6 hours per 8 hour workday with normal breaks; pushing/ pulling with bilateral upper extremities frequently;

2

operating foot controls with the lower extremities frequently on the right and occasionally on the left, never climb ladders, ropes or scaffolds; climb ramps and stairs up to 1/2 workday, or four hours out of an 8-hour workday; frequently balance, occasionally stoop, kneel and crawl; never crouch; avoid concentrated noise and hazards . . .; limited to occupations which do not involve exposure to direct sunlight (does not include the normal exposure incurred traveling to and from work); limited to occupations that which do not require complex written or verbal communication or frequent telephone communication; fast paced production requirements and involving only simple, work-related decision and few if any work place changes that are introduced gradually; only occasional interaction with the public; and can be around co-workers throughout the day but with only occasional interaction with co-workers.

. . . .

6. [Plaintiff] is unable to perform any past relevant work.

. . . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . . .

11. [Plaintiff] has not been under a disability, as defined in the [] Act, from [the amended alleged onset date] through the date of this decision.

(Tr. 15-26 (internal parenthetical citations omitted) (emphasis added).)

## **DISCUSSION**

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope

3

of [such] review . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "[C]ourts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

[Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Hall, 658 F.2d at 264. "These regulations

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment,

---

[2] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citation omitted).

the ALJ must assess the claimant's residual function capacity ("RFC")." Id. at 179. Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80.[3] However, if the claimant establishes an inability to return to his or her prior employment, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry the "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## Assignment(s) of Error

Plaintiff contends the Court should overturn the ALJ's finding of no disability because, in formulating Plaintiff's RFC, the ALJ "improperly evaluated Plaintiff's credibility and the medical record regarding the severity and effects of her pseudotumor cerebri ('PTC')." (Docket Entry 11 at 1; see also id. at 5 (citing VE testimony showing that, if deemed credible, Plaintiff's description of the severity of her headaches would preclude her from obtaining competitive employment).)[5]  Defendant argues otherwise and seeks affirmance of the ALJ's ruling. (Docket Entry 13 at 1-3, 6-13.)  Plaintiff has shown several errors pertaining to the ALJ's handling of issues related to Plaintiff's PTC that require remand for further administrative proceedings.

### Conflict between Step Two and RFC Findings about PTC

As noted above, the ALJ found (at step two) that Plaintiff "has the following severe impairment[]: . . . headaches secondary to [PTC] . . . ." (Tr. 17 (emphasis added).)  To support that finding, the ALJ stated that "[t]reatment notes from [Plaintiff's]

---

[5] PTC "is a disorder of elevated spinal fluid pressure in the brain. It causes headaches, possible blurred vision and, without treatment, can lead to blindness." Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *1 n.1 (D.R.I. Mar. 3, 2015) (unpublished); see also Holmes v. Colvin, Civil Action No. 1:13-3430-BHH, 2014 WL 6773359, at *2 n.2 (D.S.C. Dec. 2, 2014) (unpublished) (describing PTC as "buildup of cerebrospinal fluid that causes increased intracranial pressure [with] symptoms, which include headache, nausea, vomiting, and pulsating sounds within the head, [] similar to those of large brain tumors").  Plaintiff also has identified a second issue of "[w]hether the ALJ improperly evaluated the medical opinion evidence" (Docket Entry 11 at 1), but Plaintiff's argument on that point simply restates aspects of her above-quoted, primary argument concerning the ALJ's evaluation of Plaintiff's PTC (compare id. at 5-10, with id. at 10-11).  Accordingly, this Memorandum Opinion will not separately address Plaintiff's second issue.

physicians and the reports of a consultative physician . . . confirm that [Plaintiff] has . . . headaches secondary to [PTC] . . . ." (Id. (emphasis added).) Moreover, in formulating Plaintiff's RFC, the ALJ recognized that, consistent with the foregoing step two finding (and medical records supporting it), at the hearing on February 6, 2013, Plaintiff "testified that she has a headache disorder. . . . She has been told the headaches are due to pressure build-up." (Tr. 19 (emphasis added); see also Tr. 58 ("Q [Plaintiff], you became disabled primarily due to your headache disorder, is that correct? A Right. Q Okay. And do you have a headache everyday or occasionally at this point? A No. It's an everyday thing." (emphasis added)).)

However, the ALJ's RFC findings described PTC not as an ongoing cause of Plaintiff's headaches (as the step two ruling indicated), but only as a former condition. (Tr. 21 ("The medical evidence confirms that [Plaintiff] has intracranial hypertension, a history of [PTC], and a history of occipital neuralgia, and those conditions have resulted in [her] having frequent headaches." (emphasis added)).) In that regard, after documenting that Plaintiff "ha[d] undergone multiple lumbar punctures . . . [and] had a shunt implanted with a subsequent shunt revision surgery" (id.),[6] the ALJ asserted that records from December 2012 from the

_____

[6] In this context, "'shunts' . . . are designed to drain fluid away from [the] brain." Wood v. Medtronic Xomed Inc., No. 13CV90LM, 2015 WL 2342799, at *1 (D.N.H. May 14, 2015) (unpublished); see also Patterson v. Bayer Healthcare
(continued...)

"neurosurgeon who performed the implantation of the shunt, the shunt revision and the lumbar punctures . . . question[ed] whether [Plaintiff's] headaches were from [PTC,] . . . not[ed] that [her] spinal tap pressure was normal and [] stated that [PTC] had likely resolved" (id.; see also id. (declaring that Plaintiff's neurosurgeon "ultimately concluded that [Plaintiff's] headaches were not coming from [PTC], as [it] had likely resolved")).

If (on March 29, 2013) Plaintiff's "headaches were not coming from [PTC because, as of December 2012, her PTC] had likely resolved" (as the ALJ determined for purposes of Plaintiff's RFC) (id.), the ALJ's simultaneous finding (on March 29, 2013) that (for purposes of step two) Plaintiff "has" a "severe impairment[]" of "headaches secondary to [PTC]" (Tr. 17) makes no sense. See, e.g., Grady v. Commissioner of Soc. Sec., No. 12CV13349, 2013 WL 4670365, at *11 (E.D. Mich. Aug. 30, 2013) (unpublished) ("[The] [p]laintiff claims that the ALJ erred by not listing her plantar fasciitis and heel spurs as severe impairments. . . . [T]he medical evidence showed that [the] [p]laintiff's condition resolved with surgery. The [c]ourt therefore concludes that the ALJ did not err by not including plantar fasciitis and heel spurs as severe impairments

---

[6](...continued)

Pharm., Inc., No. 1:14CV1087-LJO-JLT, 2015 WL 778997, at *2 (E.D. Cal. Feb. 24, 2015) (unpublished) (describing surgical implanting of shunts as therapy employed for "severe cases" of PTC). "A lumbar puncture involves placing a needle in the subarachnoid space of the spinal column to measure pressure and to obtain cerebrospinal fluid for laboratory examination." Carrington v. Secretary of Dep't of Health & Human Servs., No. 99-495V, 2007 WL 1753513, at *2 n.9 (F. Cl. May 29, 2007) (unpublished); see also Long v. Apfel, 1 F. App'x 326, 328 (6th Cir. 2001) (discussing use of "lumbar punctures to alleviate pressure from excess spinal fluid associated with [PTC]").

. . . .").  In sum, the conflict between the ALJ's assessment of
Plaintiff's PTC at step two and at the RFC-formulation stage
requires a remand.  See, e.g., Clifford v. Apfel, 227 F.3d 863, 872
(7th Cir. 2000) ("[The ALJ] must build an accurate and logical
bridge from the evidence to his [or her] conclusion.").

    Further, if on remand the ALJ revises the step two findings to
match the present RFC findings (i.e., to reflect that Plaintiff
only suffered from headaches attributable to PTC until December
2012) and if substantial evidence supports that conclusion, "what
is missing from the ALJ's discussion [at present] is whether th[at]
impairment[] . . . render[ed] [Plaintiff] disabled for any time
period prior to [December 2012]."  Decker v. Colvin, No. 13C1732,
2014 WL 6612886, at *11 (N.D. Ill. Nov. 18, 2014) (unpublished).
In other words, if Plaintiff's PTC-based headaches resolved in
December 2012, she still may have qualified for a period of
disability benefits if that impairment prevented her from working
for at least a one-year period before December 2012 and after her
amended alleged onset date of June 14, 2011.  See Hall, 658 F.2d at
264 (quoting 42 U.S.C. § 423(d)(1)(A) for proposition that
"disability" means "'inability to engage in any substantial gainful
activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months'").  "As a result, [the Court also should]

remand for the ALJ to determine whether [Plaintiff] was disabled at any time after her alleged onset date and prior to [any resolution of her PTC in December 2012], and to properly explain the basis for the conclusion that he reaches." Decker, 2014 WL 6612886, at *12.

<u>Lack of Substantial Evidence for Determination that
Plaintiff Suffered No PTC-Caused Headaches after December 2012</u>

In addition to pointing out the inconsistency between the ALJ's findings concerning PTC at step two and in connection with Plaintiff's RFC (see Docket Entry 11 at 9), Plaintiff maintains that the record evidence, if properly considered, should have led the ALJ to recognize that Plaintiff's "PTC did not resolve [in December 2012] and her headaches continued because of [PTC]" (id.). Grounds for remand exist on that front as well.

As a basis for deciding that, from December 2012, Plaintiff's PTC did not cause headaches, the ALJ gave this justification:

> [Plaintiff's neurosurgeon] noted in December 2012 that it was questionable whether [Plaintiff's] headaches were from [PTC] vs. the lumbar puncture [she underwent on November 27, 2012]. He also noted that [her] spinal tap pressure was normal and he stated that [her PTC] had likely resolved. He discharged [her] from his care and he advised [her] to continue treatment with her neurologist for her headaches.

(Tr. 21 (internal citation omitted) (citing Tr. 550).) The first of those characterizations of the record does not support a finding that Plaintiff's PTC ceased producing headaches by December 2012 because, as she correctly has observed, in the cited medical record, her neurosurgeon "did <u>not</u> state that he was unsure if [her]

12

chronic headaches were due to lumbar puncture as opposed to PTC.
. . . Rather, he was unsure if the [then-]current exacerbation of
her head pain was due to the recent lumbar puncture procedure as
opposed to her usual PTC head pain." (Docket Entry 11 at 9
(emphasis added); see also Tr. 550 ("[Plaintiff] had undergone a
lumbar puncture on 11/27/12 and reported to the ER with increased
headaches. Questionable whether this is related to the [PTC] vs
lumbar puncture." (emphasis added)).)

Moreover, contrary to the ALJ's above-quoted statement,
Plaintiff's neurosurgeon did not report that Plaintiff's PTC "had
likely resolved" (Tr. 21); instead, her neurosurgeon offered an (at
least) arguably, more qualified statement: "Most likely that her
[PTC] had resolved." (Tr. 550 (emphasis added).) Specifically, by
using the adverb "most" to modify "likely," Plaintiff's
neurosurgeon appeared to indicate that, at the moment of his
writing, three or more "likely" scenarios existed in regards to
Plaintiff's PTC and that resolution of the condition represented
the leading possibility from that group. See Webster's New World
Dictionary 928 (2d college ed. 1980) (defining adverb form of
"most" as "in or to the greatest degree" and noting that it often
pairs with adjectives "to form the superlative degree"); A Writer's
Reference 113 (2d ed. 1992) (noting that "[m]ost adjectives and
adverbs have three forms: the positive, the comparative, and the
superlative," directing writers to "[u]se the comparative to

13

compare two things, the superlative to compare three or more," and citing as an example: "Hobbs is the most [not more] qualified of the three candidates"). Given that the word "likely" itself conveys a lack of certainty, see Webster's New World Dictionary at 819 (defining "likely" as "apparently true to the facts; credible; probable); see also id. at 1132 (defining "probable" as "that can reasonably but not certainly be expected"), the above-quoted declaration by Plaintiff's neurosurgeon about the status of Plaintiff's PTC fails to provide an adequate foundation for a finding that, after December 2012, Plaintiff did not experience headaches attributable to PTC.

Nor do the normal pressure reading on November 27, 2012, and/or Plaintiff's discharge to her neurologist in December 2012 (the other sources of record support cited by the ALJ on point) warrant a determination that, after December 2012, PTC no longer caused Plaintiff headaches. Often with PTC, "it may take years before normal pressure is maintained . . . [and] PTC[] may also recur throughout a patient's lifetime." Patterson v. Bayer Healthcare Pharm., Inc., No. 1:14CV1087-LJO-JLT, 2015 WL 778997, at *2 (E.D. Cal. Feb. 24, 2015) (unpublished) (emphasis added). Accordingly, a single normal pressure reading cannot establish that Plaintiff had achieved any lasting resolution of her PTC as of December 2012, particularly given that, in January 2013, her neurologist deemed PTC present and not controlled (see Tr. 577 (stating that

14

Plaintiff's PTC "has failed medical management")). Indeed, according to Plaintiff's neurologist, by January 2013, Plaintiff's neurosurgeon may have changed the opinion he expressed in December 2012 about the possible resolution of Plaintiff's PTC. (See id. ("[Plaintiff] continues to have headaches. She went back to [her neurosurgeon] and he discussed with her doing an LP shunt."); see also Tr. 20 ("[According to Plaintiff,] [h]er neurosurgeon has said that the shunt is not working correctly because it clogs. She has had a revision, but the shunt closed all the way. Her only option now is to get a new shunt through her stomach – they cannot revise the shunt she has now again.").)

Under these circumstances, the Court should remand for the ALJ to re-visit Plaintiff's RFC because substantial evidence fails to support the ALJ's material, underlying finding that, after December 2012, Plaintiff did not suffer headaches due to PTC. Moreover, to the extent the ALJ discredited Plaintiff's testimony about her headache symptoms based on a determination that, as of December 2012, PTC did not cause any headaches (see Tr. 21), the Court also should require the ALJ to reconsider that subject.

Other Errors in the Evaluation of Plaintiff's Symptom Reporting

As a final matter, Plaintiff complains that, in the context of formulating her RFC, the ALJ also "avoided a finding of disability in this case by finding that [Plaintiff] was not credible regarding the severity and frequency of her headaches [but] . . . [t]he

15

reasons relied upon by the ALJ are not supported by the evidence
. . . ." (Docket Entry 11 at 5 (citing Tr. 21-23); see also Tr.
19-20 (recounting Plaintiff's testimony, in relevant part, as
follows: "She has headaches every day and the pain is an 8 on a
pain scale of 1 to 10 with 10 being the worst pain. She has
blurred vision and sometimes has nausea and vomiting. Her hands
shake due to the headaches. She has urinary incontinence. She has
been told the headaches are due to pressure build-up. . . .
[S]pinal tap[s] released the pressure for a couple of days and then
the pain returned. . . . She does not drive because she never
knows when she will get a terrible headache. Some headaches are
worse and affect her vision. She has headaches that affect her
vision every day. Her vision is affected in some way 9 out of 10
times that she has a headache. . . . [A]fter riding 15 minutes [in
a car] her headache increases, and this keeps her from leaving home
much.").) On this point, the record again confirms that the ALJ
made errors that require a remand.

The Social Security Administration's Policy Interpretation
Ruling Titles II and XVI: Evaluation of Symptoms in Disability
Claims: Assessing the Credibility of an Individual's Statements,
SSR 96-7p, 1996 WL 374186, at *2, as applied by the Fourth Circuit
in Craig, 76 F.3d at 594-95, provides a two-part test for
evaluating a claimant's statements about symptoms, including pain.
"First, there must be objective medical evidence showing 'the

16

existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 594 (quoting 20 C.F.R. § 404.1529(b)). Upon satisfaction of part one, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the symptoms, as well as the extent to which they affect the claimant's ability to work. Id. at 595. At that point, the fact finder:

> must take into account not only the claimant's statements about her pain, but also all the available evidence, including the claimant's medical history, medical signs, and laboratory findings, any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.), and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Id. (internal citations and quotation marks omitted).

In this case, the ALJ ruled as to part one that Plaintiff's impairments reasonably could have produced the alleged symptoms. (Tr. 21.) Regarding part two, however, the ALJ deemed Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [] not entirely credible . . . ." (Id.) To discredit (at least in part) Plaintiff's account of her headache-related symptoms (in addition to the above-discussed, flawed determination that PTC did not cause headaches after December 2012), the ALJ identified the following support:

17

1) "[Plaintiff] told her primary care physician, Dr. Mark Dood, that, at their maximum, the severity of her headaches was 'moderate' – she did not say they were 'severe'" (Tr. 21);

2) "[Plaintiff] underwent [an] initial shunt implantation on June 27, 2011 and on August 29, 2011, she complained of only a 'slight' headache that was worse with lying down" (id.);

3) "treatment notes [from Plaintiff's neurologist] also show that [Plaintiff] was primarily having severe headaches in the morning when she first got up and they got better as the day went on" (id. (citing Tr. 533));

4) "[Plaintiff] may be exaggerating to some extent the severity of her headaches, as she testified at the hearing that she has urinary incontinence due to the headaches but has never mentioned urinary incontinence to any of her doctors" (id. (emphasis added));

5) "a consultative psychological report . . . shows that [Plaintiff] complained of physical pain, nonstop on a daily basis, but, in contrast, she easily completed the two-hour assessment without registering any verbal or physical symptoms suggesting discomfort" (id. (citing Tr. 446));

6) "that [consultative] report also indicates that [Plaintiff] has a very long history of headaches, dating back to between the ages of 10 and 14, . . . [but] she was able to work for many years in skilled positions despite her headaches" (id.);

18

7) Plaintiff "frequently complained of blurred vision, but treatment notes from her ophthalmologist show her visual acuity is 20/40 in each eye . . . [and the above-referenced consultative report] made no mention of any vision problems during the testing portion of the evaluation" (id. at 21-22 (citing Tr. 441-47, 509));

8) "treatment notes from [Plaintiff's] doctors show her headaches are no more than 'moderate' and occur primarily in the mornings" (id. at 22); and

9) "[Plaintiff] is able to perform her activities of daily living . . . [which] suggest[s] that her pain does not significantly impair her ability to concentrate" (id. at 23; see also id. ("[Plaintiff] testified at the hearing that she goes to the store with her mother and she washes dishes. [The Function Report from Plaintiff's mother] indicates that [Plaintiff] prepares simple meals, shops for 35 to 45 minutes every other week, and attends church when able. She is able to handle her finances and [the consultative psychological report] shows she watches television in the afternoons and evenings (with the volume low) and she enjoys cooking." (citing Tr. 275-82, 442)).

For reasons detailed below, at least six of the nine above-quoted observations by the ALJ suffer from serious defects that preclude the Court (at least on the present record) from treating them as viable justifications for the discrediting of Plaintiff's symptom reporting. As a result, the Court should remand.

19

For example, via items one, three, and eight above, the ALJ stated or suggested that the record uniformly shows that Plaintiff did not suffer severe headaches or, at most, endured significant headaches only in the early morning. In fact, Plaintiff's medical documentation reflects that, from shortly before her alleged onset date forward, she repeatedly reported severe headaches, not restricted to the start of the day (but instead only marginally less severe later in the day). (See Tr. 301 ("Follow-up Note" by Plaintiff's primary care physician dictated May 31, 2011: "Still having <u>bad</u> headaches." (emphasis added)), 321 (letter from Plaintiff's neurologist to her primary care physician dated May 4, 2011: "[Plaintiff] also has had <u>significant</u> headaches. . . . She describes a throbbing headache at least 3 or 4 times a week." (emphasis added)), 355 (consultation report by Plaintiff's neurosurgeon dictated June 24, 2011: "[Plaintiff] states her headaches are <u>worse</u> in the morning and get <u>somewhat</u> better as day progresses." (emphasis added)), 364 (examination report from Plaintiff's neurologist dictated June 16, 2011: "[Plaintiff] clearly has <u>worse</u> headaches in the morning and they get <u>somewhat</u> better as the day goes on." (emphasis added)), 453 ("Follow-up note" by Plaintiff's primary care physician dictated March 14, 2012: "Still has what [Plaintiff] rates as <u>10/10</u> headache." (emphasis added)), 454 ("Follow-up note" by Plaintiff's primary care physician dictated March 1, 2012: "[Plaintiff] is still

having <u>bad</u> headaches, she has [PTC]. . . . She does have <u>a lot</u> of headache pain." (emphasis added)), 471-73 (emergency room records for visit by Plaintiff on April 7, 2012, documenting her description of "severe" headache), 519 ("Office Note" from Plaintiff's neurosurgeon dated March 21, 2012: "[Plaintiff] says some days her headaches are <u>consistent all day</u>." (emphasis added)), 533 ("Office Note" from Plaintiff's neurologist dated August 8, 2012: "[Plaintiff's] headaches are <u>severe</u> and they are high-pressure headaches, being <u>quite severe in morning</u> when she gets up and better as the day goes on." (emphasis added)).)

Similarly, in item two above, the ALJ implied that the implementation of a shunt relieved Plaintiff's PTC-caused headaches beginning in the summer of 2011, but the record demonstrates that her shunt did not prove a lasting solution. (<u>See, e.g.</u>, Tr. 453 ("Follow-up note" by Plaintiff's primary care physician dictated March 14, 2012: "[Plaintiff] is still having a lot of headaches. History of [PTC] has not responded well to shunt placement."), 527 ("Follow-up note" by Plaintiff's primary care physician dictated April 18, 2012: "Recently [Plaintiff] has been having a lot of difficulties with headaches due to [PTC] and unable to get the pressure right. Since I saw her a month ago, she has had her shunt adjusted 3 times."). The record also flatly contradicts the ALJ's assertion (in item four above) that Plaintiff "<u>never</u> mentioned urinary incontinence to any of her doctors" (Tr. 21 (emphasis

21

added)).  See Tr. 305 ("Follow-up note" by Plaintiff's primary care physician dictated January 18, 2011:  "[Plaintiff] has a lot of pressure type headaches, her vision has been blurred. . . .  She also has some incontinence.").)  Finally, although Plaintiff did work despite a history of headaches dating to her early adolescence (as the ALJ stated in item six above), the record indicates that her PTC headaches emerged later in her life and differed from her earlier headaches.  (See, e.g., Tr. 364 ("[Plaintiff] knows that she has the past history of migraine headaches, but she realizes this is a different type of headache, superimposed.").)

Given these considerations, the Court should vacate the ALJ's finding that Plaintiff's statements about the extent of her headaches lack credibility and should remand for reassessment of that subject based on a proper review of the record.

## CONCLUSION

Plaintiff has established error(s) warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) be granted in part and denied in part, in that the Court should vacate the denial of benefits and should remand the case for administrative reassessment of the medical record and the

22

credibility of Plaintiff's symptom reporting regarding her PTC. In particular, the Court should require:

1) resolution of the conflict between the ALJ's step two finding that, as of March 29, 2013, Plaintiff suffered from headaches due to PTC and the ALJ's RFC-stage finding that Plaintiff's PTC resolved as of December 2012;

2) a determination of whether, even if Plaintiff's PTC resolved by December 2012, she nonetheless qualified for a closed period of benefits during the time between her alleged onset date of June 14, 2011, and December 2012;

3) reconsideration (based on a proper review of the record) of whether Plaintiff's PTC actually resolved by December 2012; and

4) reassessment (based on a proper review of the record) of the credibility of Plaintiff's symptom reporting regarding her PTC.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 22, 2015